**Richard L. HUBEL and Horsemen's Benevolent and Protective Association, Appellants,**

v.

**The WEST VIRGINIA RACING COMMISSION, Appellee.**

No. 74–1894.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 10, 1975.

Decided April 3, 1975.

Phillip J. Campanella, Cleveland, Ohio (Lawrence I. Byrnes, Spieth, Bell, McCurdy & Newell, Cleveland, Ohio, George A. Chadwick, Jr., and Chadwick

& Titus, Washington, D. C., on brief), for appellants.

William D. Highland, Asst. Atty. Gen. of West Virginia (Chauncey H. Browning, Jr., Atty. Gen., and Phillip D. Gaujot, Asst. Atty. Gen. of West Virginia, on brief), for appellee.

Before BRYAN, Senior Circuit Judge, and WINTER and CRAVEN, Circuit Judges.

WINTER, Circuit Judge:

We are asked to hold invalid, as offending due process of law, a rule of the West Virginia Racing Commission which prohibits a stay of any suspension of an owner's or trainer's permit to engage in horseracing, suspended under a rule which permits the stewards at a racing meeting summarily to suspend owners' and trainers' permits with respect to any horse found to have been "doped," pending a hearing and formal determination of the person or persons responsible

therefor. The district court held the rule prohibiting a stay valid and dismissed the suit questioning its validity. We agree and affirm the district court.

## I.

The thoroughbred racehorse Morning Ground, owned by plaintiff, Richard L. Hubel, won the third race at Waterford Park, Wheeling Downs, West Virginia, on May 7, 1973. Allegedly because of violations of Rule Nos. 793 and 795(b) [1] of the West Virginia Racing Commission, the stewards at Waterford Park, by order entered May 23, 1973, suspended Hubel's owner-trainer license for a period of 47 days effective from May 15, 1973, to June 30, 1973, inclusive.[2] The order also denied Hubel access to Waterford Park racetrack and disqualified Morning Ground from the purse.

Hubel appealed from the track officials to the West Virginia Racing Commission.[3] The appeal was entered June

---

1. The text of the rules follows:

   **Rule 793.** TRAINER AS INSURER OF CONDITION OF HORSE: PENALTY.
   The trainer shall be the absolute insurer of and responsible for the condition of the horse entered in a race, regardless of the acts of third parties. Should the chemical, or other analysis of saliva, or urine samples, or other tests prove positive showing the presence of any narcotic, stimulant, depressant, or local anesthetic, the trainer of the horse may have any or all of the following penalties inflicted—be fined, be suspended, his license revoked, or ruled off and in addition the owner of the horse, the foreman in charge of the horse, the groom, and any other person shown to have had the care, or attendance, of the horse may have any or all of the following penalties inflicted—be fined, be suspended, his license revoked, or ruled off.

   **Rule 795(b).**

   Should the analysis of any saliva, urine, or other sample taken from any horse show the presence of any substance, other than the prohibitive drugs set forth in Rule 793 which is the result of any oral, topical or injected medication which has not been prescribed, administered or dispensed by a licensed veterinarian, the trainer and any other person shown to have had the care of or attendance of the horse may be fined or his license suspended or both.

2. The stewards acted under Rule 802, which provides:

   A majority of the Stewards at any horse race meeting may suspend a license and such suspension or revocation shall be effective immediately. The Stewards shall, as soon as thereafter practicable, make and enter an order to that effect and serve a copy thereon on the license holder, either personally or by certified mail, return receipt requested. Such order shall state the grounds for the action taken.

3. Hubel was exercising the right given him by W.Va.Code Ann. § 19–23–16(c) (Michie 1971), which states:

   Any person adversely affected by any such order shall be entitled to a hearing thereon if, within twenty days after service of a copy thereof if served in any manner in which a summons may be served as aforesaid or within twenty days after receipt of a copy thereof if served by certified mail as aforesaid, such person files with the racing commission a written demand for such hearing. A demand for hearing shall operate automatically to stay or suspend the execution of any order suspending or revoking a license, but a demand for hearing shall not operate to stay or suspend the execution of any order suspending or revoking a permit. The racing commission may require the person demanding such hearing to give reasonable

6, 1973—two weeks after entry of the order of suspension. By virtue of the provisions of Rule 804, the suspension of Hubel's permit was not stayed pending a determination of his appeal, notwithstanding that he sought, by formal motion, to be granted a stay.[4] Suit was filed in the district court on June 18, 1973. Joined as a co-plaintiff was Horsemen's Benevolent and Protective Association, an entity alleged to represent "the rights and interests of thoroughbred horsemen collectively." The complaint sought a declaration that the no-stay provision of Rule 804 was unconstitutional and a mandatory injunction restraining execution of the suspension order pending appeal. When the suspension expired before the case could be heard, plaintiff abandoned his prayer for injunctive relief.[5]

## II.

To address the merits of Hubel's appeal, it is desirable first to set forth what is not in issue. The West Virginia Racing Commission does not dispute that Hubel's permit as an owner-trainer is a property right and that due process requires that Hubel be given notice, a hearing, and an opportunity to defend his interest if the permit is to be suspended or revoked. Hubel does not dispute that his permit may be suspended or revoked if, after notice and a hearing, it is established that Morning Ground

was stimulated or given depressants or anesthetics so as to affect his performance in the race. Where the parties part company is whether a suspension may *precede* the notice and hearing which due process requires. West Virginia asserts that the temporal aspect of the right to notice and a hearing is a flexible concept dependent upon the facts of each case, and that here there are good and valid reasons why the notice and hearing should succeed, and not precede, the initial suspension which, in turn, should be continued until the hearing and final determination. Hubel contends otherwise; but, significantly, Hubel makes no claim that the West Virginia Racing Commission failed to act with due dispatch, or attempted to delay the hearing guaranteed under the rules once Hubel exercised his right to have the Commission review the action of the stewards.[6]

The temporal relation between notice and a hearing and deprivation of a right or property interest protected by the due process clause was the subject of recent examination in Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). That case concerned the suspension of school students for disciplinary purposes. It held that due process requires notice and a modified hearing in the usual case *before* a student is suspended for infraction of a school rule or standard governing his conduct. The significance of the case here is its recog-

security for the costs thereof and if such person does not substantially prevail at such hearing such costs shall be assessed against such person and may be collected by an action at law or other proper remedy.

These provisions of the statute are embodied in Rule 803 which provides a right to a hearing and Rule 804 which specifies that a demand for a hearing shall not operate as a stay of the suspension of a permit. It should be noted, however, that the statute refers to a trainer's authorization as a "permit" while the rules refer to it as a "license."

4. We were told in argument that when Hubel's permit was suspended in West Virginia, it was also suspended in other states where he was licensed as a matter of reciprocity.

5. Thus, plaintiffs sought, in effect, only declaratory relief and a three-judge court was not

required. *See* Mitchell v. Donovan, 398 U.S. 427, 90 S.Ct. 1763, 26 L.Ed.2d 378 (1970); Rosario v. Rockefeller, 458 F.2d 649, 651–52 and n.2 (2 Cir. 1971), aff'd 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1, reh. den., 411 U.S. 959, 93 S.Ct. 1920, 36 L.Ed.2d 419 (1973).

6. Rule 805 imposes a duty on the Commission to act with due dispatch once an owner or trainer seeks review of the action of the stewards. It provides:

Upon receipt of the written demand for such hearing, in accordance with Rule 803, a time and place not less than ten (10) nor more than thirty (30) days thereafter will be set by the Commission. Any scheduled hearing may be continued by the Racing Commission upon its own motion or for good cause shown by the person demanding the hearing.

nition that the due process clause "'negates any concept of inflexible procedures universally applicable to every imaginable situation,'" citing Cafeteria Workers v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961), and that "the timing and content of the notice and the nature of the hearing will depend on appropriate accommodation of the competing interests involved." 419 U.S. at 579, 95 S.Ct. at 738. Even though the case held that in the usual situation the notice and hearing should *precede* the suspension of any student, the Court recognized that this was not always the rule:

> We agree with the District Court, however, that there are recurring situations in which prior notice and hearing cannot be insisted upon. Students whose presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process may be immediately removed from school. In such cases, the necessary notice and rudimentary hearing should follow as soon as practicable, as the District Court indicated. 419 U.S. at 582, 95 S.Ct. at 740.

Our own decision in Christhilf v. Annapolis Emergency Hospital Ass'n, Inc., 496 F.2d 174 (4 Cir. 1974), is another example of when due process does not require prior notice and hearing before suspension of a property interest. There, we held that a physician was entitled to notice and a hearing before staff privileges previously extended to him at the defendant hospital were revoked. In directing the district court to grant injunctive relief against expulsion if a notice and hearing were not afforded, we were careful to say that the district court "need not" grant a preliminary injunction:

> Although such an injunction may often be proper, due process does not always require a hearing before a doctor's privileges are suspended. The gravity of the charges, the findings of the medical board and staff, and the

delay and expense caused by Dr. Christhilf's withdrawal from the hearing afford ample justification for denying him interlocutory relief. 496 F.2d at 180.

## III.

Thus, this case resolves itself into a determination of whether Hubel's normal and usual right to notice and hearing before disciplinary sanctions are applied is outweighed by competing interests so as to permit notice and hearing to follow temporary suspension. We think that it is because an owner-trainer in Hubel's position presents the same kind of "continuing danger" which concerned us in *Christhilf* and the Supreme Court in *Goss*.

The state has at least two substantial interests to be served. It has a humanitarian interest in protecting the health of the horse, and it has a broader and more weighty interest in protecting the purity of the sport, both from the standpoint of protecting its own substantial revenues derived from taxes on legalized pari-mutuel betting and protecting patrons of the sport from being defrauded. Collectively, these interests, we think, justify the severe penalty of disqualifying a horse that has been drugged, its trainer and perhaps its owner, from further participation in legalized racing until the matter can be heard and determined and an appropriate final sanction formulated. The combination of strict liability, imposed by Rule 793, and immediate suspension without the possibility of stay, deters tampering and promotes care. The combination also removes from racing those who have proved either unable or unwilling to protect their horses from unauthorized drugs.

The humanitarian aspect of preventing the administration of drugs to a horse to affect his performance need not be further expounded. The state's interest in maintaining the integrity of racing may be briefly stated. If a horse is fleeter or

slower than his normal speed because of having been drugged, the integrity of the race is irretrievably lost. Of course, if stimulated, his artificial position at the finish may be corrected and he may be deprived of any purse that he apparently won. But the interests of bettors cannot be protected. Winning tickets must be paid promptly at the end of the race before the disqualification of the horse, except for the most obvious reasons, can be accomplished. And if a depressant has been administered to the horse, it may well be that bettors on that horse may be fraudulently deprived of the fruits of their wagers because the horse does not end in the money, as he might have otherwise done. Thus, the drugging of a horse, even if not intentional by his owner, trainer, groom and handlers, alters the pattern of the outcome of the race, rewarding some bettors who would have lost, or rewarding them more than would have otherwise been justified, or defeating some bettors who should have been rewarded.

These considerations have led the West Virginia Racing Commission to adopt Rules 793 and 795(b) which render the owner, trainer, etc., the absolute insurers of the integrity of the horse.[7] Should the offense of "doping" a horse be committed, whether by intentional act of his handlers or negligence in protecting him from the depredations of outsiders, the offense is so serious and the consequences so severe that absolute protection to the horse and to the public is fully warranted until the matter can be formally resolved. The public is entitled to protection from the continuing danger that one who participates in drugging his horse will do so again, and that one who fails to protect his horse from drugging by others will repeat his negligence. We hold that these considerations justify the mandatory denial of a stay of any suspension for violation of the rules pending the notice and hearing that the due process clause requires. Rule 804 does not deny due process of law.

Affirmed.

7. The Supreme Court of Appeals of West Virginia has expressed its approval of the validity of the rules. State ex rel. Morris v. West Virginia Racing Commission, 133 W.Va. 179, 194– 95, 55 S.E.2d 263, 271 (1949). The validity of these rules is not questioned on state or federal grounds in this appeal.