**William P. PHILLIPS,**
**Plaintiff,**

v.

**Donald E. PURYEAR et al.,**
**Defendants.**

**Civ. A. No. 75–0038.**

United States District Court,
W. D. Virginia,
Lynchburg Division.
Sept. 30, 1975.

Paul J. Forch, Asst. Atty. Gen., Richmond, Va., for plaintiff.

Alexander W. Bell, Lynchburg, Va., for defendants.

## MEMORANDUM OPINION

TURK, Chief Judge.

In this suit filed pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3) and (4) plaintiff William Phillips seeks damages and declaratory and injunctive relief from the Chancellor of the Virginia Community College System,[1] the President of Central Virginia Community College (CVCC), the Dean of Arts and Sciences at CVCC and two professors at CVCC. The gravamen of plaintiff's complaint is that his dismissal from his

---

1. At the close of the evidence plaintiff abandoned his claim for damages against the Chancellor.

teaching position as an Associate Professor of Health, Physical Education and Recreation at CVCC violated his constitutional rights to procedural due process of law and freedom of speech. Trial of this case was held before the court in Lynchburg, Virginia on September 17 and 20, 1975, and on the basis of the evidence presented the court has reached the following findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

### Findings of Fact

For the most part the facts are not in dispute. Plaintiff was employed as an assistant or associate professor of health, physical education and recreation by CVCC from September, 1969 until February 28, 1975. His employment during this period was pursuant to one-year contracts covering the six school years. During the 1974–75 school year plaintiff applied for a multi-year appointment beginning the following school year (i. e. September, 1975), and in accordance with the procedures at CVCC his application was forwarded to the Ad Hoc Appointment Advisory Committee (hereafter the Ad Hoc Committee). This committee was composed of fourteen persons drawn from the faculty and administration at CVCC, and its purpose was to make recommendations to the President of CVCC (defendant Puryear) as to whether or not a faculty member should be given a multi-year appointment. The report which this committee prepared on the plaintiff and his reaction to it precipitated the dispute which has resulted in this lawsuit.

The report prepared by the Ad Hoc Committee concerning the plaintiff can fairly be described as a document wholely unworthy of an institution of higher learning. When the committee met to consider plaintiff's application for a multi-year appointment, they were given access to plaintiff's official personnel file which contained pertinent information relative to his job performance. Plaintiff's file contained no negative information and indicated that he had been given an "excellent" rating by his Division Chairman. The committee supplemented this information with a questionaire sent to 20 faculty members in the Division of Humanities and Social Sciences, and a personal appearance by the plaintiff. Following plaintiff's appearance, the committee was polled by secret ballot, and by a vote of seven to six (Chairman Bashore not voting) decided not to recommend plaintiff for a multi-year contract. The chairman of the committee then appointed two members to write a report to the President of CVCC regarding this decision.

Despite the absence of any negative information in plaintiff's official file or any reliable testimony or other evidence critical of the plaintiff, the two authors of the report were able to prepare a rather harsh evaluation of the plaintiff. To a large extent this was accomplished by making reference to unsubstantiated rumors or hearsay about plaintiff.[2] But even more disappointing than the substance of the report is the fact that it was forwarded to the President as representing the conclusions of the committee, yet most of the members of the committee had never seen it.

On the morning of Thursday, February 27, 1975 plaintiff received a copy of the report together with a letter from the President informing him that his application for a multi-year contract had

---

2. The report did not indicate the substance of the responses received from the questionaires but did conclude from the fact that most of the questionaires were not answered that plaintiff had a lack of positive relationships with fellow faculty members. None of the faculty members who failed to respond were questioned as to the reason for this failure and at trial one member of the Ad Hoc Committee (who had not seen the report) indicated that the lack of faculty response to the questionaire was due to the fact that some of the recipients considered the questions to be unfair.

been denied.[3] Plaintiff's initial response to this report was to write out a six page rebuttal to it which he intended to deliver to the President. On the afternoon of February 27 plaintiff visited Mr. Bashore, the chairman of the committee, in his office to express his concern about the report. At the beginning of this meeting plaintiff was upset and hostile toward the members of the committee and stated to Mr. Bashore that he was considering a lawsuit because of the report. Plaintiff detailed his objections to the report to Mr. Bashore and expressed his concern that his professional reputation and career had been unfairly stigmatized. Mr. Bashore explained that he had not written the report and that most of the committee members had not even seen it. Mr. Bashore suggested that plaintiff convey his objections to the President since he was the person who could act on them. By the end of the meeting plaintiff had calmed down, and it was then that he commented on the difficult assignment Mr. Bashore had been given as chairman of the committee and referred to a judge in Louisa County, Virginia who had been shot and the Commonwealth Attorney in Christiansburg, Virginia had been maimed. Mr. Bashore was confused by these references and considered them unnecessary to the conversation. The following morning Mr. Bashore related his meeting with plaintiff to Dr. Puryear and told him that he could expect a visit from plaintiff. Mr. Bashore then left for a conference in Blacksburg, Virginia.[4]

On Friday morning February 28 at approximately 8:30 A.M., plaintiff left the trailer in which he was living and went to the house he owned, which at that time was being rented by Shelby Gribble. There he placed a phone call to Tom Scott, a colleague of his and a member of the Ad Hoc Committee, who he had reason to believe was responsible for much of the negative information in the report. At plaintiff's request Shelby Gribble listened to his end of the conversion.[5] Although certain of the specifics of this conversation are in dispute, the court finds the substance of the conversation to have been as follows. Plaintiff expressed his disappointment with the committee's report and indicated that he felt that Mr. Scott was largely responsible for the report; he called Mr. Scott an idealist and stated that if he did not know him better or if he did not have better control he would punch him in the nose if he saw him at school on that day; he mentioned that he might contact a lawyer and pursue a civil or criminal action if his job were jeopardized; he stated that Mr. Scott had more to lose than he did and referred to his (Scott's) wife and family and indicated that Scott could call Cheryl (plaintiff's former wife) in Richmond to verify his statements. Mr. Scott told plaintiff not to threaten him, and plaintiff stated that the call was not a threat.

Mr. Scott then called his attorney and inquired as to what action he could take against the plaintiff. He was told that if he had been threatened he could obtain a warrant for plaintiff's arrest or he could send plaintiff a certified letter forbidding him from trespassing on his property and thereafter prosecute him if he did trespass. Mr. Scott did neither of these things. He did call Dr. Puryear and related his conversation with plaintiff. Dr. Puryear told him to write out what had been said over the phone. At that point Dr. Puryear called Mr. Bashore in Blacksburg

---

3. At trial Dr. Puryear indicated that he did not consider the report to have been very well prepared, however he apparently accepted its recommendation without further inquiry.

4. Mr. Bashore attempted to see Dr. Puryear that afternoon but was unable to locate him.

5. In his findings following the adversary hearing Dr. Puryear completely discounted Mrs. Gribble's testimony. Her testimony was not impeached and at trial the court found her to be a most credible witness.

and briefly told him of the incident involving Mr. Scott and asked that he also write out an account of his meeting with the plaintiff on the previous day. Dr. Puryear then called plaintiff and told him to come to his office that afternoon. At this meeting plaintiff denied that he intended to threaten anyone and pleaded with the President not to be suspended. Dr. Puryear was apparently unimpressed with plaintiff's explanation, and therefore summarily suspended him and forbade him from returning to campus even to meet his scheduled classes. Defendant Merritt, the Dean of Student Services, was also present at the meeting between plaintiff and Dr. Puryear and strongly recommended that plaintiff be suspended. The summary suspension of plaintiff was undertaken pursuant to Section V–D of the "Procedure for Dismissal of College Personnel Holding Faculty Rank" (hereafter "Procedure for Dismissal") [6]

On March 3, 1975 Dr. Puryear appointed five persons from CVCC as an Ad Hoc Review Committee to investigate the incidents involving plaintiff and Messrs. Scott and Bashore. This action was taken pursuant to Level III–C of the "Procedure for Dismissal". On March 13, 1975 the committee submitted its report to Dr. Puryear. On the basis of this report, which concluded that plaintiff had threatened Scott and his family and Bashore, Dr. Puryear by letter dated March 20, 1975 dismissed plaintiff from his faculty position.

Pursuant to Section III–D of the "Procedure for Dismissal" plaintiff appealed his dismissal to the President. At this stage plaintiff was afforded a hearing with the right to counsel, cross-examination, witnesses etc. By letter dated May 1, 1975 Dr. Puryear notified plaintiff that from the evidence presented at the hearing he had concluded that just cause existed for his dismissal. Basically, Dr. Puryear found that plaintiff had deliberately threatened Mr. Scott and his family and Mr. Bashore in an effort to change the report of the Ad Hoc Appointment Advisory Committee.

Plaintiff then appealed this decision to the Chancellor of the Community College System as prescribed by Section III–E of the "Procedure for Dismissal". By letter dated July 3, 1975 plaintiff's counsel was informed by the Chancellor that he had affirmed Dr. Puryear's decision dismissing plaintiff. Plaintiff did not appeal the Chancellor's decision to the State Board for Community Colleges as he could have pursuant to Section III–F of the "Procedure for Dismissal". On the crucial question of whether plaintiff threatened anyone, the court must disagree with Dr. Puryear's findings. The court finds as a fact that plaintiff did not intend to threaten Mr. Bashore other than possibly with legal action. Plaintiff's reference to a judge who had been shot and a Commonwealth Attorney who had been maimed were no more than crude analogies by which plaintiff sought to commiserate with Mr. Bashore concerning the difficulties of his job as chairman of the Ad Hoc Committee. Furthermore, Mr. Bashore did not consider this statement to be a threat until after Dr. Puryear had called him the next day and informed him of another incident.

Similarly, plaintiff's telephone conversation with Mr. Scott did not rise to the level of an actual threat of physical harm. The reference to punching Mr.

---

6. Section V–D of the "Procedure for Dismissal provides:

*Immediate Suspension*—Nothing in the procedures described herein shall prevent the president from suspending the faculty member immediately if the president deems the continued presence of the faculty member to be a substantial threat to the welfare of the institution. In such a case, the president shall ensure that a hearing at the appropriate level is provided as soon as possible."

In plaintiff's case the president determined the appropriate level to be III–C which by-passed level III–A (conference between the faculty member and his immediate supervisor) and level III–B (conference between faculty member and his dean).

Scott in the nose was sufficiently qualified so as to amount to a harmless hyperbole. The reference to Mr. Scott's wife and family in the context of what he (Scott) had to lose is more serious, however plaintiff's explanation of these statements is entirely credible and logical. Plaintiff first indicated to Mr. Scott that the report was unfair and that he felt that Mr. Scott was responsible for it. He then attempted to point out to Mr. Scott that his professional career was jeopardized by the report and that his job meant very much to him because it was all he had left, whereas Mr. Scott had a wife and family in addition to his job. Plaintiff indicated to Mr. Scott that he might pursue legal action against him because of the report, and that more than just his job could be affected (i. e. his wife and family). Plaintiff's statement that Mr. Scott could call his former wife in Richmond —who Scott knew plaintiff had sued for adultery—is thus consistent with the threat of legal action and plaintiff's indication that all he had left was his job. Yet despite the fact the court is convinced that plaintiff did not intend to physically threaten Mr. Scott, the court does not believe that Mr. Scott's reaction was completely feigned. Mr. Scott did to an extent feel threatened, however his reaction to this perceived threat was, to a substantial degree, colored by the fact that he had harbored negative feelings toward plaintiff for some time and considered him "unprofessional".

The court also finds from the evidence that Dean Merritt had negative feelings toward the plaintiff, unrelated to the incidents involving Messrs. Bashore and Scott, and these feelings were in part responsible for his recommendation that Dr. Puryear immediately suspend plaintiff from the campus.

### Conclusions of Law

Plaintiff's procedural due process challenge to his dismissal is two-fold: he first contends that in view of the severity of the sanction imposed, he should have been afforded a pre-suspension hearing at which he could confront his accusers; secondly, he challenges the adversary hearing which was ultimately afforded him on the basis that it was not held before an impartial hearing examiner.

■ There can be no doubt that plaintiff's suspension and dismissal substantially implicated both his property and liberty interests. On February 22, 1975 when plaintiff was summarily suspended from his job and prohibited from returning to campus, he was subject to a contract which ran until the end of the school year and had been offered a one-year contract for the following year. Both of these contracts were property interests entitled to Constitutional protection. *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1971); *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1971). In addition, the fact that the basis for plaintiff's suspension was the preliminary determination that he posed a "substantial threat to the welfare of the institution" unquestionably implicated his Fourteenth Amendment liberty interest. *E. g., Wisconsin v. Constantineau*, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). It is thus clear that plaintiff was constitutionally entitled to procedural safeguards, and the issue is simply whether the procedures employed in this case were sufficient.

■ With respect to the timing of the hearing afforded plaintiff, the court is of the opinion that an adversary hearing prior to plaintiff's initial suspension was not constitutionally mandated. Although the plaintiff's property and liberty interests which were implicated by his suspension were clearly substantial, the competing interests of the college in maintaining order justify the procedures employed in this instance. In reaching this conclusion the court notes that before suspending plaintiff Dr. Puryear had received evidence from two faculty members which indicated that plaintiff might have threatened them with physi-

cal harm. But even more important is the fact that before suspending plaintiff Dr. Puryear confronted him with the charges and gave him an opportunity to explain his behavior. The court believes that under these circumstances *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), sanctions the rudimentary hearing given plaintiff as a constitutionally adequate prerequisite to his initial suspension. The court is further of the opinion that the Supreme Court's decision in *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L. Ed.2d 15 (1974) establishes that the full adversary hearing subsequently afforded plaintiff was temporally sufficient as a matter of procedural due process in the circumstances of this case. *See Hubel v. West Virginia Racing Commission,* 513 F.2d 240 (4th Cir. 1975).

 Plaintiff further contends that the adversary hearing which was ultimately held was constitutionally defective because it was not held before an impartial hearing examiner. Specifically, plaintiff objects to the fact that Dr. Puryear had gathered evidence and ruled against him at the time of his initial suspension of February 20, 1975 and again on March 20, 1975 when he dismissed him on the basis of the report by the five members Ad Hoc Review Committee. Plaintiff argues that because of this past involvement in his case, as a matter of law Dr. Puryear could not impartially judge his case. Since Dr. Puryear's involvement in the various stages of the administrative process were pursuant to the "Procedure for Dismissal", plaintiff in effect challenges those regulations as being facially unconstitutional to the extent that they fail to provide for a hearing before a person having no prior involvement in his case.

Just such an argument was considered and rejected in the case of *Duffield v. Charleston Area Medical Center,* 503 F. 2d 512 (4th Cir. 1974). In that case the Governing Board of the defendant hospital had followed the recommendation of its Department of Surgery and revoked plaintiff's hospital privileges. Plaintiff had then appealed to the Joint Conference Committee where he was given an adversary hearing. In his subsequent lawsuit plaintiff contended that those members of the Governing Board who had participated in the initial revocation of his privileges were disqualified to sit or vote as members of the Joint Conference Committee. In rejecting this argument the court stated the controlling standard to be.

> "that the bias and familiarity with a case, which will disqualify, 'must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case,' *United States v. Grinnell Corp.* (1966) 384 U.S. 563, 583 [86 S.Ct. 1698, 1710, 16 L.Ed.2d 778] . . . ." 503 F.2d at 517.

The court viewed the action of the Governing Board as "an administrative step in bringing the issue to a head, much as the issuance of a show cause order in connection with an application for preliminary injunctive relief in judicial proceedings sets the stage for a valid hearing on the issues presented by such application." 503 F.2d at 519.

To the same effect is the recent case of *Withrow v. Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975) in which the Supreme Court unanimously rejected a procedural due process challenge to a statutory scheme which allowed an examining board to both investigate a doctor's conduct and thereafter on the basis of such investigation hold a "contested hearing" in order to determine if his license to practice medicine should be revoked. The Court's conclusion that "[t]he mere exposure to evidence presented in nonadversary investigative procedures is insufficient in itself to impugn the fairness of the board members at a later adversary hearing" (421 U.S. at 55, 95 S.Ct. at 1468) is dispositive of plaintiff's contention that the process employed in his case was facially defective.

However the Court in *Withrow* also stated, "[o]f course, we should be alert to the possibilities of bias that may lurk in the way particular procedures actually work in practice" (421 U.S. at 54, 95 S.Ct. at 1468), and it is in this regard that this court has grave doubt that Dr. Puryear was able to maintain the necessary impartiality at plaintiff's adversary hearing. From the court's consideration of the evidence presented at the trial of this case it is apparent that CVCC was a tightly-knit community which was severely divided by the incidents involving plaintiff and the actions taken by Dr. Puryear. The court finds as a fact that Dr. Puryear's ability to judge the case impartially at plaintiff's adversary hearing was impaired by his earlier decisions which had been based on the recommendation of Dean Merritt and the findings of the five members of the Ad Hoc Review Committee. Although the court does not believe that Dr. Puryear was consciously partial in making his decision, it does find from the evidence that Dr. Puryear had prejudged the credibility of some of the witnesses—most notably Mr. Bashore and Dean Merritt—and that his decision was to an extent influenced by his prior determinations and the negative feelings toward plaintiff among certain persons at the college. However, because plaintiff has now had a plenary hearing before this court, his claim that he was denied due process of law has been rendered moot and further administrative proceedings would be unnecessarily duplicative.

The remaining issue presented by this case is the plaintiff's claim that his dismissal violated his constitutional right to freedom of speech. Before resolving this claim two issues raised by the defendants with respect to the court's jurisdiction must first be considered.

Defendants first assert that the plaintiff's failure to exhaust his administrative remedies is a bar to this court's jurisdiction. The dispositive case with respect to this contention is *McCray v. Burrell,* 516 F.2d 357 (4th Cir. 1975) (en banc) in which the court squarely held that the exhaustion of administrative remedies was not a prerequisite to the maintenance of a suit under 42 U.S.C. § 1983 by state prisoners. The present case is not distinguishable simply because plaintiff was a state teacher rather than a prisoner. The necessary elements for a cause of action under § 1983 have been alleged in this case and no more is required.

The second issue raised by the defendants concerns the scope of the court's jurisdiction and requires only brief comment. Defendants cite the recent case of *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) for the proposition that a federal court may not review the judgmental decisions of college administrators. In *Wood* the Court was speaking to a situation in which a federal court had entertained a substantive due process claim based on the sufficiency of the evidence supporting the administrative decision. The case at bar is wholly different in that the issue presented is whether plaintiff was deprived of liberty and property as the result of his exercise of constitutionally protected speech. To extend the holding in *Wood* to such a situation would be a radical departure from the traditional role of the courts as the final arbiters of constitutional issues. By its own terms *Wood* does not go this far:

"... § 1983 was not intended to be a vehicle for federal court correction of errors in the exercise of that discretion *which do not rise to the level of violations of specific constitutional guarantees.*" 420 U.S. at 326, 95 S.Ct. at 1003. (emphasis added).

Finally, the court concludes from its review of the evidence that plaintiff's dismissal was in violation of his right to freedom of speech. In this regard several points should be emphasized. This is not a case in which plaintiff's contract was not renewed because of his failure to maintain good relations

with fellow faculty members; rather in this case plaintiff was dismissed in the middle of a school year and branded a "substantial threat to the welfare of the institution" solely on the basis of two brief conversations with fellow faculty members. The speech which resulted in these severe sanctions against plaintiff was in the context of criticism of a report which had stigmatized him. There is no doubt that plaintiff's rights under the Constitution allowed him to criticize the report of the Ad Hoc Committee and those persons who prepared it and it is further clear that this criticism, as such, could not be a basis for his dismissal and stigmatization. *Jannetta v. Cole*, 493 F.2d 1334 (4th Cir. 1974) and cases there cited. However, it is equally clear that true threats of harm to others do not fall within the realm of protected speech. *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); see *Watts v. United States*, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969).

In this case the court has found that plaintiff's statements were not unprotected threats and that the later reactions of Mr. Scott and, to a lesser extent Mr. Bashore, could not make them threats. It follows that the actions taken against plaintiff by Dr. Puryear were in violation of his constitutional rights and must be corrected.

### Relief

■ Because plaintiff was dismissed and stigmatized in violation of his constitutional rights, he is entitled to reinstatement, which in this case is a teaching contract for the current school year. *Jannetta v. Cole, supra*, at 1338. Plaintiff is also entitled to back pay, however the parties have represented to the court that plaintiff was paid for the entire 1974–75 school year and therefore only back pay, if any, for the current school year is required. The defendants will also be required to expunge plaintiff's records containing any mention of the dismissal proceedings described in this opinion.

■ Plaintiff has also asked for damages from the various defendants. The standard which plaintiff has to meet to overcome the qualified immunity of the defendants is stated in *Wood v. Strickland, supra*, 420 U.S. at 322, 95 S. Ct. at 1001:

> "A compensatory award will be appropriate only if the school board member has acted with such an impermissible motivation or with such disregard of the student's clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith."

Under this standard the court cannot award damages against Dr. Puryear. Although the action he took was improvident and completely out of proportion to the circumstances, it was, in the court's judgment, taken in good faith and without impermissible motivation. Similarly, the evidence clearly establishes the good faith immunity of Robert Bashore. On the other hand, a closer question is presented with respect to the role of Tom Scott and Dean Merritt in plaintiff's dismissal. The evidence could perhaps support a finding of improper motivation and disregard for plaintiff's rights on the part of these individuals. However, the court does not find from the evidence that these individuals were motivated by actual malice toward plaintiff, and therefore punitive damages are not in order. In addition, it must be noted that the actions taken against plaintiff were the result of Dr. Puryear's decision, and although Messrs. Merritt and Scott influenced those decisions, there was no evidence of a conspiracy. Dean Merritt and Mr. Scott were entitled to criticize plaintiff and express their biased opinions to Dr. Puryear regarding the actions he should take against him; but absent actual malice, the court is of the opinion that they cannot be held liable for Dr. Puryear's decisions. For these reasons the

court is constrained to deny plaintiff's claims for damages.

### Attorney's Fees

In *Alyeska Pipeline Service Co. v. The Wilderness Society*, 421 U.S. 240, 95 S. Ct. 1612, 44 L.Ed.2d 141 (1975) the Supreme Court stated the general rule to be that attorney's fees were not recoverable in the absence of a federal statute authorizing such awards. The only exceptions which the Court recognized to this holding were cases in which a common fund for the benefits of others was produced or cases in which the losing party had acted in bad faith, vexatiously, wantonly or for oppressive reasons. Neither of these exceptions apply to the case at bar and attorney's fees will therefore be denied. Plaintiff may however recover his taxable costs from the defendants.

An order in conformity with this opinion shall be entered this day.